**IN THE UNITED STATED DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | |
|---|---|
| Brook-Hollow Capital, LLC,<br><br>Plaintiff, | Court File No.: 7:24-cv-00466<br><br>Hon. Judge Fernando Rodriguez, Jr. |
| v. | |
| Garcia Law Group, PLLC and<br>Maria L. Garcia,<br><br>Defendants. | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Brook-Hollow Capital, LLC ("BHC") submits this memorandum of law in support of BHC's Motion for Summary on each of its claims asserted against Defendants Maria L. Garcia ("Garcia") and the Garcia Law Group PLLC ("GLG") (collectively, the "Garcia Parties"), and on the Garcia Parties' counterclaim for fraudulent misrepresentation. As there are no material facts in dispute and BHC is entitled to judgment as a matter of law on each of its claims and the Garcia Parties' lone counterclaim, this matter is ripe for summary judgment.

## INTRODUCTION

This case is, at its core, a straightforward commercial loan collection action disguised as a fraud dispute. The undisputed evidence establishes that the Garcia Parties repeatedly requested and received approximately $4.2 million in loan proceeds from BHC via two separate loans, executed unambiguous loan agreements and personal guaranties, repeatedly acknowledged their indebtedness, directed third parties to pay attorneys' fees directly to BHC, then defaulted on their obligations and refused repayment.

Unable to dispute that they received the funds or that they failed to repay BHC, the Garcia Parties attempt to avoid liability through a belated and legally deficient fraud theory based upon alleged oral representations and marketing materials concerning a separate attorney-fee deferral transaction with non-party Kenmare Assignment Company Limited ("Kenmare"). Not only have the Garcia Parties failed to produce a single shred of evidence in support of their allegations of fraudulent misrepresentation, but the unambiguous terms of the written contracts defeats all of the Garcia Parties' defenses and establishes BHC is entitled to judgment as a matter of law. The loan agreements contain broad integration clauses, non-reliance provisions, acknowledgments that no oral representations existed outside the written agreements, and express waivers executed by Garcia, who is a sophisticated party and a practicing attorney for more than a decade.

As set forth in greater detail below, the undisputed evidence will show:

- The Garcia Parties, with the assistance of Garcia's father Willie Garcia, sought out and solicited multi-million dollar loans from BHC due to financial need.

- GLG requested and received a $2,000,000 loan from BHC in February 2017 at a fixed annual interest rate of 15 percent, subject to a contractual default rate.

- GLG later requested a second loan advance of $2,224,651.97 in December 2018. At GLG's direction, $1,224,651.97 was applied to the 2017 loan balance and $1,000,000 was wired to GLG.

- Garcia executed unconditional personal guaranties covering principal, interest, fees, expenses, attorneys' fees, and collection costs for each loan.

- The loan documents granted BHC a security interest in GLG's accounts and payment rights, including rights to receive attorneys' fees for legal services.

- GLG entered into a separate Non-Qualified Assignment and Release (the "Assignment Agreement") with Eastern Point Trust Company and Kenmare in December 2018, under which GLG assigned to Kenmare all rights and ownership to attorneys' fees in the amount $2,293,455.64.

- Kenmare invested GLG's assigned attorneys' fees in accordance with the Investment Policy Statement GLG executed. Kenmare has produced indisputable evidence of the current value of said investment, including investment interest.

- The Assignment Agreement expressly disclaimed guaranteed investment performance, advised GLG to obtain independent legal and tax advice, and confirmed GLG has no rights to the deferred attorneys' fees until 2039.

- The Garcia Parties spent the loan proceeds they acknowledge that they received from BHC.

- The Garcia Parties failed to make required payments to BHC and failed to provide contractually required financial information to BHC.

- In October 2021, the Garcia Parties directed that attorneys' fees earned from the Webster Arrieta Durango Plane Crash litigation be paid to BHC, further acknowledging BHC's entitlement to payment. The Garcia Parties later reneged on their promise.

- As of September 16, 2026, the Garcia Parties owe BHC $8,022,991.18 in outstanding principal and interest, plus attorneys' fees and costs, with additional interest accruing at $1,696.45 per day.

Because no genuine issue of material fact exists regarding (1) the existence and enforceability of the loan agreements and guaranties, (2) BHC's performance thereunder, (3) the Garcia Parties' defaults, and (4) the Garcia Parties' inability to establish essential elements of their fraud-based claim, summary judgment should be entered in favor of BHC on its claims and against the Garcia Parties on their fraud-based counterclaim.

## UNDISPUTED MATERIAL FACTS

The relevant facts of this case are best understood by separating and analyzing the three contracts involving the Garcia Parties. The three relevant contracts are as follows: (1) a February 2017 Master Loan and Security Agreement between BHC and GLG (the "2017 Loan Agreement"); (2) a December 2018 Non-Qualified Assignment and Release amongst GLG, Eastern Point Trust Company ("EPTC"), and Kenmare (the "Assignment Agreement"); and (3) a December 2018 Master Loan and Security Agreement between BHC and GLG (the "2018 Loan Agreement"). The written agreements establish that BHC funded GLG with approximately $4.2 million in loan proceeds, while Kenmare, not BHC, assumed obligations associated GLG's attorney fee deferral. Each contract is exclusive of the others, and should be analyzed separately for purposes of analyzing each parties' claims and defenses. The plain and unambiguous terms of these contracts establish as a matter of law that BHC is entitled to an order for summary judgment on each of its claims and on the fraud-based claims and defenses asserted by the Garcia Parties.

### I. General Background Facts.

BHC is in the business of making loans to lawyers and law firms, including law firms whose fees depend on the resolution of contingency-fee matters. (Declaration of Austin J. Malinowski ("Malinowski Decl."), Ex. 1 at 77:18-24)). Brook-Hollow Financial, LLC ("BHF"), a wholly separate and independent entity serves as the marketing arm and administrative agent for Kenmare. (Malinowski Decl., Ex. 2 at 47:3-7). Kenmare is an independent Irish company that manages non-qualified structured settlements and attorney fee deferrals. (Malinowski Decl., Ex. 1 at 63:19-64:10). Staigue Fort Investment Company Limited ("Staigue Fort"), another independent Irish Company, is a special purpose entity that receives funds from assignment companies via participating notes and invests such funds in accordance with the terms of an investment policy statement. (*Id*. at 69:19-25). Kenmare, Staigue Fort, and BHC are completely separate entities and

operate independent of each other. (*Id*. at 104:21-105:9). While neither BHF, Kenmare, or Staigue Fort are parties to this litigation, it is undoubtable that the Garcia Parties will attempt to confuse the entities and present them as one.

GLG is a Texas law firm, and Garcia serves as its managing partner. (Malinowski Decl., Ex. 3, 200:6-201:18). Garcia is a sophisticated attorney in Texas who has been practicing law since 2010, generally engaged in plaintiff's side personal injury work. (*Id.* at 12:24-13:18). Garcia's father, Wilfrido "Willie" Garcia, played an instrumental role in soliciting and facilitation of obtaining the loans from BHC that are at issue. (*Id*. at 90:19-91:5).

In August of 2015, Jason Webster, Webster Vicknair Macleod's ("Webster") managing partner, introduced Garcia and Willie Garcia to BJ Etscheid of BHC. (Malinowski Decl., Ex. 4). Following the introduction, Willie Garcia almost immediately requested a multimillion dollar loan from Mr. Etscheid, BHC's former CEO, without ever meeting in person or ever receiving any marketing materials or information pertaining to BHC's loan program. (*See* Malinowski Decl., Ex. 5 at 28:2-9) Jason Webster made certain representations to either the Garcia Parties or Willie Garcia pertaining to BHC's loan program prior to the parties' introduction. (*Id*. Ex. 3 at 28:4-30:5).

Between August of 2015 and February of 2017, Mr. Etscheid and Willie Garcia engaged in various conversations regarding GLG's request for a loan from BHC. (Malinowski Decl., Ex. 5 at 29:13-30:12). Garcia was absent from many of the telephone meetings, and could have only learned of what was discussed during such meetings from Willie Garcia, not BHC's representatives. (*See Id*. Ex. 3 at 38:6-25). Garcia admitted that GLG was in need of funding to expand its business, and to address outstanding income tax obligations, which is why BHC's loan program was so appealing. (*See id*. at 30:3-17).

However, Garcia claims that certain misrepresentations were made by representatives of BHC during meetings that occurred prior to signing any contractual documentation. (Doc. No. 38, at ¶121) Garcia further claims she relied upon certain online marketing materials she independently located in conjunction with the transactions with BHC and Kenmare. (Malinowski Ex. 3, at 166:9-167:5). Importantly, there is no record produced by any party in discovery that the Garcia Parties ever received any marketing materials directly from BHC, nor is there any record or evidence of BHC making any of the following representations:

- BHC or BHF's tax plan was "foolproof"
- The Internal Revenue Service ("IRS") approved of the tax plan;
- BHC and BHF had been utilizing the tax plan offered to GLG for years and never had a complaint or inquiry filed by the IRS;
- If an IRS inquiry or complaint was ever made, BHC would advise GLG of the inquiry or complaint; and
- GLG's deferred attorneys' fees would be invested in safe reliable investments and would provide GLG with substantial rewards when the funds were paid back.

(*Id*. at 165:17-22; 185:4-189:2; 193:16-25; Doc. No. 38, at ¶ 121).

Notably, Garcia admitted that she had no documents which would establish any of the alleged misrepresentations were ever actually made by BHC. (*Id*. at 165:17-22; 185:4-189:2). Ultimately, the Garcia Parties voluntarily decided to seek out and accept a loan from BHC. (*Id*. at 39:9-12).

## II. The 2017 Loan Agreement.

On February 22, 2017, GLG, through Garcia, voluntarily executed a Request for Loan Advance, under which GLG requested a $2,000,000 loan from BHC with an interest rate of 15 percent (the "2017 Loan"). (Declaration of Tate Johnson ("Johnson Decl."), Ex. 1). That same day,

Garcia on behalf of GLG executed the 2017 Loan Agreement, which is governed by Illinois law. (Johnson Decl., Ex. 2). Under the 2017 Loan Agreement, the 2017 Loan carried a fixed interest rate of 15 percent per annum, which may be increased by a rate of 18 percent in the event of a default, such as a missed payment. (*Id*. at 2). The balance of the 2017 Loan's principal and interest would become due and owing on February 28, 2020. (*Id*. at 3).

Under the 2017 Loan Agreement, the 2017 Loan was secured, in part, by certain collateral owned and controlled by GLG. The collateral for the 2017 Loan Agreement made to GLG is described as "[a]ll accounts, general intangibles, payment intangibles, and all similar rights that Borrower may have of every nature and kind, including specifically and without limitation, all of Borrower's rights to receive payment or otherwise, for legal and other services rendered and to be rendered." (the "Collateral"). (Johnson Decl., Ex. 2, at 3-4). Pursuant to the 2017 Loan Agreement, GLG agreed not to sell, offer to sell, transfer, or dispose of the Collateral. (*Id*. at 4).

The 2017 Loan Agreement stated that the following constitute events of default, entitling BHC to the right to demand immediate payment in full of all obligations, including payment of principal, interest, attorneys' fees, and costs of collection: (1) failure to make timely payments; (2) adverse change in the Garcia Parties' financial conditions; (3) making false statements; (4) insolvency; and (5) breach of any obligation owed to BHC.

The 2017 Loan Agreement also contains a bolded acknowledgement that unequivocally states the following: (1) GLG agreed to the terms of the agreement and all other related documents "without duress or coercion," (2) GLG carefully read the agreement and related documents and related terms; (3) GLG knowingly consented to all waivers; and most importantly (4) GLG agreed that neither BHC nor anyone on its behalf made "**ANY STATEMENT OR PROMISE THAT MAY CONTRADICT IN ANY WAY WHAT IS WRITTEN IN THIS AGREEMENT OR IN**

**ANY RELATED DOCUMENT**." (Johnson Decl., Ex. 2 at 9 (emphasis in original). Garcia, on behalf of both GLG and as guarantor, expressly agreed to each of these acknowledgements, and all other terms contained therein, by signing the 2017 Loan Agreement. (*Id*.).

Notably, Garcia admitted to voluntarily signing the aforementioned Request for Loan Advance and 2017 Loan Agreement, thereby agreeing to all of their terms, without first reading the agreements. (Malinowski Decl., Ex. 3 at 43:2-44:13; 44:20-45:21; 48:3-19). Garcia also admitted it that she had the opportunity to read the loan agreements, consult independent counsel, but chose not to as skimming agreements before signing them was her common practice. (*Id*. 48:3-19; 195:24-196:4).

As security for the 2017 Loan, Garcia executed a Guaranty (the "2017 Guaranty"), under which she unconditionally guaranteed all of GLG's obligations under the 2017 Loan Agreement up to a total monetary amount of $10,000,000.00. (Johnson Declaration, Ex. 3). Among other things, under the 2017 Guaranty, Garcia acknowledged that no oral agreements existed between the Garcia Parties and BHC that contradicted the terms of the 2017 Guaranty or any other loan documents. (*Id*. at 4). Garcia also waived any and all defenses to any claims brought by BHC, including, but not limited to, any statute of limitations defense. (*Id*. at 2). By signing the 2017 Guaranty, Garcia certified that she thoroughly read the 2017 Guaranty, knowingly agreed to all waivers thereunder, and acknowledged that nobody had made any statements to her that contradicts any term of the 2017 Guaranty or 2017 Loan Agreement. (*Id*.).

Again, Garcia admitted that she voluntarily signed the 2017 Guaranty after skimming the document without ever consulting an attorney or tax expert. (Malinowski Decl. Ex. 3 at 74:1-16; 81:17-82:4).

On February 23, 2017, BHC wired GLG $2,000,000.00 to an account ending in 3878 at Lone Star National Bank in accordance with the 2017 Loan Agreement and related documents. (*See* Johnson Decl., ¶ 5, Ex. 4). Payment of loan proceeds has never been disputed, nor has anyone on behalf of GLG ever claimed that GLG did not receive the 2017 Loan proceeds. (Malinowski Decl., Ex. 3 at 84:2-6). Garcia admitted that GLG spent the loan funds on law firm operations, thereby receiving the benefit of the bargain with BHC. (*Id*. at 84:16-86:1).

The 2017 Loan Agreement's clear terms and broad acknowledgments are incompatible with the Garcia Parties' fraud theory. The Garcia Parties acknowledged that they entered the transaction without duress or coercion, had carefully read the agreement and related documents, knowingly consented to the waivers, and had not received any statement or promise contradicting the written agreement. Garcia, a sophisticated attorney, signed the agreement on GLG's behalf and executed a personal and unconditional guaranty of GLG's indebtedness up to $10,000,000.00, including all principal, interest, fees, costs, expenses, and attorneys' fees.

**III. GLG Solicits a Second Loan From BHC.**

Shortly after executing the 2017 Loan Agreement and related documents, GLG began soliciting a second loan from BHC. Garcia recruited her father Willie Garcia to seek out a second loan from BHC to obtain additional capital for operational purposes and expenses. (Malinowski Decl., Ex. 3 at 90:19-91:5; 91:22-92:7). Between April 2018 and December 2018, Willie Garcia repeatedly contacted BHC on GLG's behalf for the purpose of obtaining additional loan funding. (*See e.g.*, Malinowski Decl., Ex. 6). In conjunction with GLG's request, Mr. Garcia sent Mr. Etscheid a list of cases GLG was handling on a contingency, which would serve as security for a second loan and be used as a source of funds to pay off GLG's outstanding loan debts. (*Id*.). Mr. Garcia claimed that GLG needed an $8 million line of credit to pay down GLG's substantial tax

debt and separate itself from the Buzbee Law Firm's unfavorable credit terms, whom purportedly served as a prior source of funds for GLG. (*Id*.).

In November and December of 2018, Willie Garcia confirmed with Mr. Etscheid that GLG wished to utilize the funds from a second loan to pay down a portion of outstanding principal and interest of the 2017 Loan, while simultaneously securing $1,000,000.00 in additional loan funds for GLG's expenses and tax liability. (Malinowski Decl., Exs. 7-8). Around this same time, GLG became interested in entering into a separate transaction with Kenmare, under which GLG would defer the receipt of attorneys' fees earned on contingency in connection with the Webster Arrieta Durango Plane Crash litigation in Hidalgo County District Court, so as to avoid the need to pay taxes on such fees until a later date. (*See id*.). There is no record of GLG, Garcia, or Willie Garcia ever expressing any concern with the terms of the deferral transaction, but only a concern with obtaining loan funds as soon as possible. In fact, Willie Garica informed BHC that GLG would not accept a loan for $650,000.00 and instead needed $1,000,000.00 to pay GLG's outstanding tax debt. (*Id*. Ex. 9). Furthermore, there is no evidence in the record of anyone ever guaranteeing the Garcia Parties a specific rate of return on any fee deferral transaction, which is expressly contradicted by the terms of the Assignment Agreement. (*See* Johnson Decl., Ex. 5 at 2).

BHC's loan transactions are separate transactions and independent from Kenmare's fee deferral transactions. (*See* Malinowski Decl., Ex. 3 at 114:15-23). While a fee deferral transaction with Kenmare is one of many considerations BHC takes into account as a future source of income (but which is expressly not available as collateral) when determining whether and how much to loan a party, there is no requirement that a party must enter into a fee deferral transaction prior to obtaining a loan from BHC (which is evidenced by the 2017 Loan transaction which is wholly

unrelated and prior to any deferral transaction). (*See* Malinowski Decl., Ex. 5 at 29:9-12; Johnson Decl., Ex. 2 at 4).

In December 2018, GLG entered into two separate transactions: (1) the Assignment Agreement with EPTC and Kenmare, under which GLG deferred receipt of attorneys' fees from the Webster Arrieta Durango Plane Crash litigation for approximately twenty years; and (2) the 2018 Loan Agreement with GLG. (Johnson Decl., Exs. 5-6.) As set forth in greater detail below, these were wholly separate transactions between different entities and were each governed by their own separate contract(s). The two transactions are mutually exclusive and each could have been entered into without the need for the other.

**IV. The Kenmare Assignment Agreement.**

Prior to the execution of the Kenmare Assignment Agreement, the defendant(s) in the underlying personal injury lawsuit in Hidalgo County District Court and/or insurance carriers funded the Webster Arrieta Durango Plane Crash QSF (the "QSF") in the amount of $2,293,455.64 (the "Deferred Fees"). (*See* Malinowski Decl., Ex. 10). BHC had no control over any funds in the QSF or any legal rights to such funds. (*See* Johnson Decl., Ex. 5.). On approximately December 12, 2018, GLG executed the Assignment Agreement with EPTC and Kenmare. (*Id.*). BHC was not a party to the Assignment Agreement and had no rights or obligations thereunder. (*Id.*). Notably, the Assignment Agreement was executed nearly two years after the 2017 Loan Agreement. (*Cf* Johnson Decl., Ex. 2; *id*. Ex. 5).

The QSF, prior to execution of the Assignment Agreement, was obligated to make payment(s) of legal fees from the underlying personal injury litigation to GLG. (*See* Johnson Declaration, Ex. 5 at 1). However, under the Assignment Agreement, the QSF assigned all obligations to make payments of the Deferred Fees to Kenmare under an agreed set of terms. (*Id.*).

GLG agreed that Kenmare "may fund its liability to make Addendum Payments by purchasing any investment(s) and/or hiring any investment manager to prudently manage any such assets. All rights of ownership and control of such investments shall be and remain vested in [Kenmare] exclusively." (*Id*. at 1). Importantly, Kenmare was not required to set any specific assets aside for GLG to make its obligatory payment to GLG in 2039. (*Id*. at ¶ 3(b)). In simplest terms, GLG relinquished all rights to the Deferred Fees to Kenmare, who agreed to manage and invest such fees until 2039. (*See id*.).

Under the Assignment Agreement, GLG agreed that it has no greater rights than a general creditor of Kenmare, and had no right to accelerate the payments of Deferred Fees set forth in the agreed upon Payment Addendum. (Johnson Decl., Ex. 5 at 1). GLG explicitly agreed under the Assignment Agreement that any payment amounts based on "investment performance . . . **ARE NOT GUARANTEED** and that [GLG] may not receive a portion of, or all of such payments." (*Id*. at 2) (emphasis in original). Thus, the Garcia Parties were aware (or should have been aware) that any return on their investment of deferred fees with Kenmare was not guaranteed, rendering any claim relating to investment returns meritless. (*Id*.)

Several of the Addenda to the Assignment Agreement are essential to understanding the transaction, and undercut the Garcia Parties' claims of fraud. First, Addendum No. 1 of the Assignment Agreement states that the Deferred Fees would not be payable to GLG until January 15, 2039, meaning GLG has no control or ownership rights in such funds for approximately thirteen more years. (Johnson Decl., Ex. 5 at 3). Second, Addendum No. 1 contains several acknowledgments that GLG explicitly agreed to, including GLG's acknowledgement that GLG has no ownership rights in the Deferred Fees and that GLG has not relied upon any "representations or guarantees made by the Assignee, its agents or assigns or the Assignor with

regards to this agreement and payments other than as set out in writing in this agreement." (*Id.*). Lastly, GLG acknowledged "that it has been advised to seek independent legal and tax counsel regarding this transaction. . . . [and] there may be future tax consequences to it as a result of entering into this transaction." (*Id.*). Each of these provisions are unambiguous and wholly undermine the Garcia Parties' fraud claims.

In addition, Addendum No. 3 to the Assignment Agreement, which was initialed by Garcia on behalf of GLG, expressly informed GLG of the transaction and management fees GLG would be charged with respect to administration of the deferral agreements and the associated Deferred Fees. (Johnson Decl., Ex. 5 at 5). Thus, the Garcia Parties were aware or should have been aware of all fee charges in connection with fee deferral transaction. Addendum No. 5 contains the same acknowledgements as Addendum No. 1, including the acknowledgement that GLG has not relied on outside representations or guarantees, and that GLG was advised to seek outside tax and legal counsel with regard to the transaction. (*Id*. at 9).

Last, and most important to the Assignment Agreement, is the Investment Policy Statement attached to the Assignment Agreement. (*See* Johnson Decl., Ex. 5 at 10-16). At its outset, the Investment Policy Statement instructed GLG to have a knowledgeable attorney review the Investment Policy Statement. (*Id*. at 10). Among other things, Exhibit One to the Investment Policy Statement explicitly proves that GLG agreed to invest the Deferred Fees in private debt, via a promissory note with Staigue Fort in the amount of $2,224,651, which became due and owing in 2038. (*Id*. at 15). While other investment instruments were available, GLG explicitly signed off on an investment of the Deferred Fees in private debt via a note with Staigue Fort. (*See id*.). The Investment Policy Statement also set forth the specific fees that GLG would be charged for the transaction, as well as all management fees. (*Id*. at 16).

Garcia repeatedly admitted that she signed and initialed the Assignment Agreement on behalf of GLG, thereby agreeing to each of the terms. (*See* Malinowski Decl., Ex. 3 at 116:3-6). Garcia also admitted that she never sought out any legal or tax advice prior to executing the Assignment Agreement despite being specifically advised to do so, and, instead, skimmed the Assignment Agreement and signed as was her typical habit as a practicing attorney. (*Id*. at 117:8-15; 119:4-22; 120:8-121:2; 123:14-124:3).

**V. The 2018 Loan Agreement.**

On December 28, 2018, Garcia, on behalf of GLG, voluntarily executed a second Request for Loan Advance, under which a total loan advance of $2,224,651.97 was requested at an interest rate of 4 percent (the "2018 Loan"). (Johnson Decl., Ex. 6 at 7; Malinowski Decl., Ex. 3 at 137:21-138:8). Notably, Garcia agreed, by way of signing the request, to a loan advance as follows: (1) $1,224,651.97 would be made payable from the 2018 Loan directly to BHC as a partial credit towards outstanding principal and interest accrued on the 2017 Loan; and (2) $1,000,000.00 would be distributed from BHC to GLG. (Johnson Decl., Ex. 6 at 8.) The Request for Loan Advance and payment of loan proceeds directly to BHC was consistent with the express authorization of GLG. (Malinowski Decl., Ex. 11).

That same day, Garcia, on behalf of GLG, voluntarily executed a second Master Loan and Security Agreement (the "2018 Loan Agreement"), which set forth the unambiguous terms of the 2018 Loan. (Johnson Decl., Ex. 6, at 9-18; Malinowski Decl., Ex. 3 at 141:14-142:16). As set forth in the 2018 Loan Agreement, GLG agreed to a fixed interest rate of 4 percent per annum on the 2018 Loan, which could be increased by 9 percent per annum in the event of a default, such as a failure to make timely payments or either interest or principal. (Johnson Decl., Ex. 6 at 10). Interest payments were required to be made to BHC quarterly, with the first interest payment due and

owing on or before April 30, 2019. (*Id.* at 11). With regard to the principal balance, Addendum A set forth the repayment schedule, concluding with a balloon payment due to BHC on November 15, 2038. (*Id*. at 18). Any failure to make a payment of either principal or interest under the terms of the 2018 Loan Agreement constituted a default of both the 2018 Loan Agreement and the 2017 Loan Agreement, and vice versa. (*Id*. at 13-14). In the event of a default of the 2018 Loan Agreement, BHC was entitled to immediate payment from GLG of all outstanding principal, interest, attorneys' fees and costs of collection without notice of default. (*Id*. at 14 ("[GLG] waives presentment for payment, protest and notice of protest, and of non-payment, with respect to [GLG's] obligations")).

Similar to the 2017 Loan Agreement, the 2018 Loan was secured, in part, by certain collateral owned and controlled by GLG. (Johnson Decl., Ex. 6 at 11-12). The collateral for the 2018 Loan Agreement is described as "[a]ll accounts, general intangibles, payment intangibles, and all similar rights that Borrower may have of every nature and kind, including specifically and without limitation, all of Borrower's rights to receive payment or otherwise, for legal and other services rendered and to be rendered." (*Id*. at 11). In addition, identical to the 2017 Loan Agreement, the 2018 Loan Agreement also provides that BHC is granted a security interest in certain of GLG's assets and entitles BHC to financial information upon request. (*Id*. at 12).

The 2018 Loan Agreement contains the following integration clause that was acknowledged by the Garcia Parties: "This agreement amends, supplements and replaces all prior agreements and written and verbal understandings between the parties with *respect to all matters discussed in or relating to this agreement.*" (*Id*. at 16) (emphasis added). Thus, GLG expressly agreed that any oral promises or agreements pertaining to the 2018 Loan, upon which the Garcia Parties' entire case relies upon (but which have never been substantiated) were supplanted by the

unambiguous terms of the 2018 Loan Agreement. (*Id*.). Much like the 2017 Loan Agreement, Garcia voluntarily signed the 2018 Loan Agreement without even reading the document and without consulting an attorney despite having the opportunity to do so. (*See* Malinowski Decl., Ex. 3 at 142:18-143:1).

As further security for the 2018 Loan, Garcia executed a Guaranty (the "2018 Guaranty"), under which she unconditionally guaranteed all of GLG's obligations under the 2018 Loan Agreement up to a total monetary amount of $10,000,000.00. (Johnson Decl., Ex. 6 at 2-5). Among other things, Garcia acknowledged that no oral agreements existed between the Garcia Parties and BHC that contradicted the terms of the 2018 Guaranty or any other loan documents. (*Id*. at 5). Garcia acknowledged that she knowingly waived any and all defenses to any claims brought by BHC, including, but not limited to, any statute of limitations defense. (*Id*. at 3). By signing the 2018 Guaranty, Garcia certified that she thoroughly read the 2018 Guaranty, knowingly agreed to all waivers thereunder, and acknowledged that nobody had made any statements to her that contradicted any term of the 2018 Guaranty or 2018 Loan Agreement. (*Id*. at 5). Garcia admitted she voluntarily signed the 2018 Guaranty after just skimming the document. (Malinowski Decl., Ex. 3 at 134:17-21; 136:2-9).

On December 28, 2018, $1,000,000.00 was wired from BHC to GLG at an account ending in 2998 at Hometown Bank in accordance with the 2018 Loan Agreement and related documents. (*See* Johnson Decl., Ex. 7). GLG's receipt of 2018 Loan proceeds has never been disputed. (Malinowski Decl., Ex. 3 at 149:2-5). BHC applied the other $1,224,651.97 to credit a portion of GLG's outstanding balance on the 2017 Loan in accordance with the Request for Loan Advance signed by Garcia, while the remaining principal and interest on the 2017 Loan remained due and owing. (*See* Malinowski Decl., Ex. 2 at 127:15-128:13).

### VI. The Garcia Parties' Loan Defaults and Acknowledgements of Debt.

Following the execution of the 2018 Loan Agreement and the receipt of $1,000,000.00 of additional loan funds, GLG defaulted on its loan repayment obligations, constituting a breach of both the 2017 Loan Agreement and 2018 Loan Agreement. Under the terms of the 2018 Loan Agreement, GLG was required to make the first interest payment to BHC on or before April 30, 2019. (*See* Johnson Declaration, Ex. 6 at 11). However, neither of the Garcia Parties made any such payment. (Malinowski Decl., Ex. 3 at 151:2-10). Throughout 2019 and 2020, BHC repeatedly notified the Garcia Parties of their outstanding balance and defaults, and demanded that the Garcia Parties make payments to get current on the outstanding principal and interest of the 2017 Loan and 2018 Loan. (Malinowski Decl. Ex. 3 at 173:6-22). Notably, the Garcia Parties failed to ever assert in writing that they were defrauded in connection with the Assignment Agreement in response to a demand for repayment despite being notified of GLG's total balance of deferred fees controlled by Kenmare and disbursement date in January 2039. (*See* e.g., Malinowski Decl., Ex. 12). In fact, Garcia admitted that she never made a claim for fraud in connection with any of the three agreements until 2024. (Malinowski Decl., Ex. 3 at 191:25-191:25).

Over the course of 2021 and beyond, BHC repeatedly demanded payment and financial information from the Garcia Parties. (*See* Malinowski Decl., Ex. 12; Malinowski Decl., Ex. 3 at 173:6-22). However, the Garcia Parties did not contemporaneously assert that the loan agreements were procured by fraud or misrepresentation. (*See* Malinowski Decl., Ex. 3 at 191:25-191:25). Instead, communications attributed to GLG promised payment to BHC when the firm received fees from other litigation matters. Specifically, on April 19, 2021, BHC sent GLG a delinquency notice, invoice of outstanding loans, and request for the Garcia Parties to enter into a payment plan. (Malinowski Decl., Ex. 12). On June 25, 2021, again after receiving a delinquency notice

and demand for repayment from BHC, Willie Garcia promised, on behalf of GLG, to repay BHC the outstanding balance owed after GLG received attorneys' fees from settling ongoing cases. (*Id.*; *see also*, *id*. Ex. 13). Mr. Garcia confirmed this acknowledgment at his deposition, authenticating his statement that the Garcia Parties "plan[ned] to pay as soon as [Garcia] gets fees" and explaining that "[t]here's no way she can pay anything until those fees come in." (Malinowski Decl., Ex. 26 at 152:7–154:5). Mr. Garcia further admitted that neither he nor Garcia ever disputed in writing that GLG received the BHC loan proceeds or owed the resulting debt, and he acknowledged his understanding that GLG had in fact received the funds from BHC. (*Id.* at 164:13–165:17; 186:25–187:12). In response to repeated demands for repayment and notices of delinquency, the Garcia Parties never once asserted in writing that the loan agreements were fraudulent or that GLG did not owe BHC a significant sum on money.

After countless attempts to secure payments through delinquency notices, personal e-mails, and requests for payment plans were unsuccessful, BHC sought to secure a payment to satisfy a portion of the Garcia Parties' outstanding debt through a Direction to Pay Letter. On May 3, 2022, Garcia voluntarily signed and delivered to BHC a Direction to Pay Letter dated October 28, 2021 (the "DTP Letter"). (Johnson Decl., Ex. 8; Malinowski Decl., Ex. 3 at 177:3-17). The DTP letter both acknowledged GLG's 2017 Loan debt and instructed Webster to pay GLG's attorneys' fee award from the Webster Arrieta Durango Plane Crash litigation directly to BHC. (*See* Johnson Decl., Ex. 8). Due to GLG's execution of the DTP letter, and anticipation of proceeds from the Webster Arrieta Durango Plane Crash litigation, BHC ceased making any further demands to the Garcia Parties for immediate payment for several months. (Johnson Decl., ¶ 10).

In May of 2023, BHC again began sending GLG demands for payment after the Garcia Parties failure to cure their defaults. In response to each correspondence, Willie Garcia explained

that GLG was working with Webster to obtain legal fees and promised to pay the fees owed to BHC. (Malinowski Decl., Ex. 14 at 2-3). Again, neither GLG, Garcia, or Willie Garcia ever claimed the loan agreements were fraudulently induced, that GLG did not owe BHC money, or challenged the outstanding payment amounts. (*See id.*) However, on December 4, 2023, GLG's newly retained counsel sent Webster a letter directing Webster not to pay BHC and to disregard the instructions in the DTP letter, effectively reneging on the prior agreement. (Malinowski Decl., Ex. 15).

The only "payment" the Garcia Parties ever made to BHC in connection with either the 2017 Loan or 2018 Loan was sourced from the 2018 Loan proceeds at the Garcia Parties' direction. (*See* Malinowski Decl., Ex. 16 at 11-12 (referencing a lone payment made in conjunction with a third and unrelated loan)). Due to the Garcia Parties' breaches of both the 2017 Loan Agreement and 2018 Loan Agreement, default interest has continually accrued on each of the loans for several years. As of September 16, 2026, the outstanding balance of principal and interest of the 2017 Loan and 2018 Loan is $8,022,991.18, which continues to accrue daily interest at a per diam rate of $1,696.45. The foregoing amount does not include BHC's attorneys' fees and costs of collection, which are recoverable under the loan documents.

## VII. Kenmare's Investments of Deferred Fees in Accordance with the Assignment Agreement.

On January 28, 2019, approximately one month after the Deferred Fees were transferred to Kenmare's control under the Assignment Agreement, a representative of Kenmare sent Garcia and Willie Garcia a copy of GLG's Kenmare investment account statement. (Malinowski Decl., Ex. 17). GLG's initial statement indicated the total value of GLG's portfolio was invested in accordance with GLG's Investment Policy Statement: a private debt through a note with Staigue Fort in the amount of $2,224,651.97 with an interest rate of 1.75 percent. (Malinowski Decl., Ex.

18). Each of GLG's subsequent account statements, which are provided to general creditors as a courtesy, issued from 2019 to the present establish that the Deferred fees were invested in accordance with the Investment Policy Statement. (*See e.g., id*. Ex. 19).

Additional correspondence sent to GLG also establishes that the Assignment Agreement was never breached by Kenmare or any other party as GLG's Deferred Fees were invested properly and previously disclosed fees were charged. In October 2019, Staigue Fort sent GLG a letter, in which GLG was notified that Staigue Fort would deduct a management fee of 65 basis points from the Deferred Fees. (Malinowski Decl., Ex. 20). However, both Addendum No. 3 to the Assignment Agreement and the Investment Policy Statement expressly allow for the imposition of management fees. Furthermore, GLG was expressly notified by Kenmare's Administrator that certain asset categories were not appearing on account statements, specifically investments in private debt, meaning any investments in private debt would not be visible on Kenmare account statements. (*Id*. at Ex. 21). There was no communication sent to the Garcia Parties which would possibly indicate their funds were invested improperly or non-existent.

As of September 23, 2026, the GLG account owned by Kenmare has a principle balance of $2,224,651.81, accrued interest in the amount of $300,571.81, and accrued management fees in the amount of $108,486.06. (Malinowski Decl., Ex. 22). The Director of Kenmare confirmed the accuracy of such account amounts. (*Id*.)

**VIII. The Summons Enforcement Action.**

Nearly a decade after the execution of the 2017 Loan Agreement, the IRS filed a legal action to enforce summons seeking documents served upon BHC's President Tate Johnson for matters relating to BHC and Brook-Hollow Financial, LLC ("BHF"). (Malinowski Decl., Ex. 23). The IRS summons enforcement action, entitled *United States of America v. Tate Johnson*, was not

commenced until October 3, 2024, meaning it would have been impossible for BHC to disclose the existence of the summons enforcement action prior to executing the any of the relevant contracts because it did not exist. (*See id*.). The summons enforcement action is no longer an active matter, and did not result in an adverse ruling or determination of wrongdoing by BHC. (*See* Doc 29). Instead, the IRS agreed to narrow the scope of the summons, and the parties ultimately came to an agreement. (Malinowski Decl., Ex. 24).

**PROCEDURAL POSTURE**

On November 8, 2024, BHC filed the Complaint in this action, in which it asserted the following claims: (1) breach of contract against GLG for breach of the 2017 Loan Agreement and 2018 Loan Agreement; (2) unjust enrichment against GLG; (3) breach of contract against Garcia for breach of the 2017 Guaranty and 2018 Guaranty; (4) specific performance demanding that the Garcia Parties produce all financial information previously demanded to which BHC is entitled to under the loan agreements; and (5) declaratory judgment demanding an order that GLG's accounts receivable and other rights to payment are subject to BHC's security interest under the loan agreements. (Doc. No. 1, BHC Complaint Against Defendants the Garcia Law Group PLLC and Maria L. Garcia ("BHC Complaint")).

On June 16, 2025, the Garcia Parties filed their responsive pleading which included, among other motions, a single counterclaim. (*See* Doc. No. 38, at ¶¶ 119-128). In their Counterclaim, the Garcia Parties asserted that BHC obtained the agreements through fraud and misrepresentation. (*Id*. ¶ 120). Notably, nearly all of the Garcia Parties claims rely upon their allegations that BHC and non-party BHF made the following misrepresentations to induce GLG to enter the two loan agreements and Assignment Agreement with Kenmare:

1. The Brook-Hollow tax plan was "foolproof"';
2. The IRS approved the Brook Hollow tax plan;

3. BHC and BHF had never had a complaint or inquiry filed by the IRS

4. BHC ad BHF would notify clients upon any IRS inquiry

5. GLG's attorneys' fees would be invested in safe and reliable investments with substantial rewards when the funds were paid back.

(*Id.* ¶ 121).

The Garcia Parties claimed each of the representations were false because: (1) the IRS filed a summons enforcement action against BHC's President Tate Johnson in 2024; and (2) BHC failed to notify GLG of the summons enforcement action. GLG claimed it suffered damages because its deferred attorneys' fees were not invested safely, despite having no right to such fees for more than twelve years. (*Id.* ¶¶ 122-128). Certainly, the entirety of the Garcia Parties claims reflect a fundamental misunderstanding of the three transactions referenced above, and plainly ignore their clear and unambiguous payment obligations under the two loan agreements.

## ARGUMENT

### I. LEGAL STANDARD

The summary judgment movant bears the initial burden of proving that no genuine dispute of material fact exists and they are entitled to judgment as a matter of law. *Searles v. City of Houston*, 180 F.4th 842, 845 (5th Cir. 2026); Fed. R. Civ. P. 56(a). Factual controversies are resolved in favor of the non-moving party, but only when the non-moving party submits evidence of contradictory facts sufficient to survive summary judgment. *Id.* "A genuine dispute of material fact exists 'if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.'" *CAM Logistics, L.L.C. v. Pratt Indus., Inc.*, 148 F.4th 346, 352 (5th Cir. 2025) (quoting *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020)). "The nonmovant must do more than cast some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated allegations, or by a scintilla of evidence." *20100 Eastex, L.L.C. v. Saltgrass, Inc.*,

180 F.4th 768, 772 (5th Cir. 2026) (internal quotations omitted). "Instead, the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Id*.

## II. <u>ARGUMENT</u>

The undisputed evidence in the record establishes that the Garcia, on behalf of GLG, voluntarily signed each and every document in conjunction with the 2017 Loan and the 2018 Loan. Instead of reading each of the documents thoroughly or consulting counsel, Garcia, a sophisticated attorney in an arms-length transaction, chose to skim through the loan documents and sign them. The loan agreements contained broad integration clauses and waivers of all oral and external representations and agreements, expressly disclaiming any reliance upon external representations and materials. Furthermore, via her voluntary execution of two guaranties, Garcia waived all defenses to BHC's claims and all reliance upon oral and external representations. These facts are fatal to the Garcia Parties' farfetched fraud claims.

The evidence unequivocally demonstrates GLG breached both the 2017 Loan Agreement and 2018 Loan Agreement, and Garcia breached both the 2017 Guaranty and the 2018 Guaranty. The Garcia Parties do not dispute receiving the loan proceeds and acknowledged spending millions of BHC's loan dollars on GLG's operations. It is undisputed that the Garcia Parties received the benefit of the bargain they made. The unequivocal evidence also proves the Garcia Parties failed to repay BHC a penny in accordance with either the 2017 Loan Agreement and 2018 Loan Agreement, undoubtedly constituting a breach of contract.

The Garcia Parties attempt to muddy the waters by claiming they were defrauded by way of GLG's fee deferral transaction with Kenmare, *i.e.* the Assignment Agreement. The Garcia Parties claim BHC guaranteed substantial returns on investment of GLG's attorneys' fees, among

other things, to induce the Garcia Parties to both enter into the loan transactions and the Assignment Agreement. However, the unequivocal evidence proves that GLG's assigned funds were invested in accordance with the Assignment Agreement and without any guaranty of returns, debunking any theory of misuse or promised returns. Furthermore, pursuant to the unambiguous terms of the Assignment Agreement, GLG presently has no ownership rights to the Assigned fees and is not entitled to a payout until 2039. Thus, the Garcia Parties have no damages and cannot state a claim for fraud as a matter of law.

This Court should see the Garcia Parties' fraud for exactly what it is: a hollow attempt to avoid repayment obligations.

### III. BHC is Entitled To Summary Judgment on its Breach of Contract Claims Against GLG.

BHC's Count I is for breach of contract against Defendants for breaching the 2017 and 2018 Loan Agreements. Under Illinois law, there are four essential elements of breach of contract: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff." *Bredemann v. Bredemann*, 2026 IL App (1st) 250815, ¶ 132, 283 N.E.3d 1110.

Under Illinois law, "[t]he measure of damages for breach of contract is the amount that will compensate the aggrieved party for the loss which either fulfillment of the contract would have prevented or which the breach of it has entailed." *Santorini Cab Corp. v. Banco Popular N. Am.*, 2013 IL App (1st) 122070, ¶ 26, 999 N.E.2d 46 (internal quotation marks omitted). "A party injured by another's breach of a contract may seek recovery in the form of damages based on its expectation interest—obtaining the benefit of the bargain—or its reliance interest—reimbursement for loss caused by reliance on a contract." *Lakeview Collection Inc. v. Bank of Am., N.A.*, 942 F. Supp. 2d 830, 857 (N.D. Ill. 2013) (applying Illinois law).

Each element is established by the undisputed evidence in the record and by Garcia's damning deposition admissions. GLG cannot manufacture a fact issue by pointing to an alleged oral representation or promotional article that contradicts the written agreements GLG signed—because, as a matter of law, a party cannot avoid an unambiguous written contract by claiming reliance on contrary oral statements it never troubled to reconcile with the documents it executed.

**A. Both the 2017 Loan Agreement and 2018 Loan Agreement are Valid and Enforceable Contracts.**

There is no dispute that BHC and GLG entered into valid and enforceable contracts, as evidenced by Garcia's own admissions. A valid contract requires an offer, an acceptance, and consideration. *Vassell v. Presence Saint Francis Hosp*., 2018 IL App (1st) 163102, ¶ 51, 106 N.E.3d 398. First, Garcia acknowledges that she, on behalf of GLG, voluntarily signed the Request for Loan Advance for a $2 million loan at 15 percent interest rate from BHC. (Malinowski Decl., Ex. 3 at 43:2-23). Garcia admitted that she signed the 2017 Loan Agreement which was consistent with the Request for Loan Advance, effectively accepting the offered loan agreement's terms. (*Id*. at 45:10-46:1). Importantly, Garcia admitted that "nobody forced me" to sign the loan documents, thereby conceding to their validity. (*Id*. at 44:7-12). Thus, GLG voluntarily accepted BHC's offer to advance loan proceeds in exchange for GLG's promise to repay principal, interest, fees, and costs, among other things.

Second, Garcia admitted that she signed a second Request for Loan Advance in connection with the 2018 Loan, conceding that she "understood that I was signing paperwork to obtain a loan." (*Id*. at 139:1-7). Garcia also admitted she signed the 2018 Loan Agreement as both as the managing member of GLG and as the guarantor of the 2018 Loan. (*Id*. at 141:23-142:16). Again, by voluntarily executing the 2018 Loan Agreement, GLG accepted BHC's offer to advance loan proceeds in exchange for GLG's promise to repay principal, interest, fees, and costs. Thus, there

is no dispute that both the 2017 Loan Agreement and 2018 Loan Agreement are each valid and enforceable contracts.

**B. BHC performed under the 2017 and 2018 Loan Agreements by Providing Millions of Dollars in Loan Proceeds to GLG.**

GLG does not dispute that BHC has performed under the terms of the 2017 Loan Agreement and 2018 Loan Agreement. Under the terms of the 2017 Loan Agreement, BHC was to furnish GLG with $2,000,000 in loan funds. On February 23, 2017, BHC wired GLG $2,000,000.00 to an account ending in 3878 at Lone Star National Bank in accordance with the 2017 Loan Agreement. (Johnson Decl., at ¶ 6, Ex. 5). Importantly, GLG admitted it received $2,000,000.00 in loan proceeds from BHC in accordance with 2017 Loan Agreement:

> "[PLAINTIFF'S ATTORNEY]: So you would agreement with me that the Garcia Law Group did receive the $2m in loan funds that it had requested [from BHC]?
> [MARIA GARCIA]: Yes."

(Malinowski Decl., Ex. 3 at 84:2-6).

It is undisputed that BHC performed its obligations under the 2017 Loan Agreement and GLG reaped the benefits of the bargain. GLG admitted that it used the loan funds "to do business, hire experts, work on cases", and for general operating funds for the law firm. (*Id*. at 84:16-22).

Similarly, there is no dispute that BHC performed its obligations under the 2018 Loan Agreement by disbursing $1,000,000.00 to GLG. GLG expressly conceded that it did not dispute receiving the 2018 Loan proceeds:

> "[PLAINTIFF'S ATTORNEY]: [Y]ou're not disputing that the Garcia Law Group received those loan proceeds; is that right?
> [MARIA GARCIA]: No. No, I'm not."

(*Id*. at 149:2-5).

Again, GLG admitted that it received the benefit of the bargain under the 2018 Loan Agreement and spent the loan proceeds it received on GLG's firm operations. (*Id*. at 149:15-17).

Accordingly, there is no dispute that BHC performed all obligations under both the 2017 Loan Agreement and 2018 Loan Agreement, proven by GLG's testimony:

> "[PLAINTIFF'S ATTORNEY]: Okay. So just to recap, the Garcia Law Group received two separate loans from Brook-Hollow Capital; correct?
> [MARIA GARCIA]: Correct.
> [PLAINTIFF'S ATTORNEY]: And you're not disputing the receipt of those loan proceeds; correct?
> [MARIA GARCIA]: Correct."

(*Id*. at 149:25-150:7). Thus, BHC undoubtedly satisfies the second element of its breach of contract claim.

### C. GLG Failed to Repay Its Loans.

Despite repeated acknowledgements of indebtedness over the course of multiple years, GLG failed pay BHC a single penny in accordance with either the 2017 Loan Agreement or the 2018 Loan Agreement. First, the 2017 Loan Agreement required GLG to repay all principal and interest on or before February 28, 2020. (Johnson Decl., Ex. 2 at 3). Any failure to pay principal or interest as required by the MLSAs constitutes a default of the loan agreement. (*Id*. at 5). BHC was not required to notify GLG of any event of default, provide notice of non-payment, but could demand "immediate payment in full of all [GLG's] Obligations, in principal, interest, fees, costs, expenses, and other charges" in the event of a default. (*Id*. at 6-7).

Second, under the 2018 Loan Agreement, GLG was obligated to make quarterly interest payments to BHC, which became due and owing on the last business day of January, April, July, and October. (Johnson Ex. 6, at 11). Any failure to make a payment of interest, principal, fees, or any other amounts due and owing under the 2018 Loan Agreement constitutes an event of default and breach of the loan agreement. (*Id*. at 13). Notably, any failure to perform with any term or condition of the 2018 Loan Agreement constituted a cross default of the 2017 Loan Agreement. (*See id*. at 14; *see* Johnson Decl., Ex. 2 at 6). Again, BHC was not required to notify GLG of any

event of default, provide notice of non-payment, but could demand "immediate payment in full of all [GLG's] Obligations, in principal, interest, fees, costs, expenses, and other charges" in the event of a default. (Johnson Decl. Ex. 6 at 6).

Throughout 2019 and 2023, BHC repeatedly notified the Garcia Parties of their outstanding balance and defaults and demanded that they become current on the principal and interest of both loans. (*See e.g.* Malinowski Decl. Ex. 12). In fact, BHC sent GLG repeated notices of default and demands for repayment during that time period, to which the Garcia Parties never disputed the outstanding loan balance. (*Id*. at Ex. 25.). Instead, Willie Garcia acknowledged the delinquency and engaged with BHC on anticipated upcoming settlements that would be used to bring the accounts current. (*See e.g.*, *id*. at Ex. 12; Johnson Decl., Ex. 9). Garcia herself acknowledged that she received the delinquency notices and forwarded them to Willie Garcia and her accountant. (Malinowski Decl., Ex. 3 at 173:6-174:4).

Based on both BHC's internal accounting records and Garcia's own admissions, GLG never made a single payment to BHC in accordance with the 2017 Loan Agreement or the 2018 Loan Agreement, constituting a breach of both. Specifically, Ms. Garcia admitted that she is not aware of any payments having been made to BHC. (Malinowski Decl., Ex. 3 at 151:2-10). Furthermore, BHC's internal accounting records prove that neither of the Garcia Parties ever made a single payment of interest or principal to BHC in conjunction with either the 2017 Loan or 2018 Loan, with the lone exception of GLG's use of loan proceeds from the 2018 Loan to pay down a portion of the 2017 Loan. (*See* Johnson Decl., Exs. 10-11). Accordingly, because the Garcia Parties failed to make an interest payment on or before April 30, 2019, the Garcia Parties breached both the 2018 Loan Agreement and 2017 Loan Agreement. As a result, BHC rightfully imposed the

default interest rate in the amounts of 13 percent on the 2018 Loan and 33 percent on the 2017 Loan beginning on May 1, 2019. (*See* Johnson Decl., Ex. 2 at 2; *id*. Ex. 6 at 2).

**D. BHC is Owed More Than $8 Million in Principal, Interest, Attorneys' Fees and Costs.**

On or around November 1, 2024, due to the Garcia Parties' failure to fulfill repayment obligations of both the 2017 Loan Agreement and 2018 Loan Agreement, BHC accelerated and called due all of GLG's outstanding principal, interest, fees, costs, expenses, and other costs of collection. (Johnson Decl., ¶ 14). Pursuant to the 2017 Loan Agreement, BHC assessed default interest at rate of 33 percent per annum on the 2017 Loan since May 1 2019. Similarly, and pursuant to the 2018 Loan Agreement, BHC assessed default interest on the 2018 Loan at a rate of 13 percent per annum beginning on May 1, 2019. As of September 16, 2026, GLG's outstanding principal and interest on the 2017 Loan and 2018 Loan is as follows:

| Loan | Principal | Accrued Interest | Total Due | Per Diem |
|---|---|---|---|---|
| 2017 Loan | $1,000,000.00 | $2,645,424.65 | $3,645,424.65 | $904.11 |
| 2018 Loan | $2,224,651.97 | $2,152,914.56 | $4,377,566.53 | $792.34 |
| Total | | | $8,022,991.18 | $1,696.45 |

(*See* Johnson Decl., Exs. 10-11).

GLG's outstanding amounts due and owing to BHC set forth herein not include BHC's attorneys' fees and costs of collection, which are separately recoverable under the loan documents. (*See* Johnson Decl., Ex. 2 at 8; *id*. Ex. 6 at 15). The undisputed evidence in the record proves that GLG's failures to repay outstanding loan debt are the direct and proximate cause of BHC's damages.

Accordingly, as there is no question of material fact as to whether GLG breached both the 2017 Loan Agreement and the 2018 Loan Agreement, BHC is entitled to judgment as a matter of law on its breach of contract claims asserted against GLG.

### E. The Garcia Parties' Fraud Defense and Affirmative Fraud Claim Are Meritless as a Matter of Law and Do Not Justify Their Breaches.

The evidence unequivocally demonstrates that the Garcia Parties received notices of default and demand for repayment for several years, and never once raised a written objection or asserted fraud. Only when their backs were against the wall and knew litigation was impending did the Garcia Parties assert they were lied to and tricked into entering into the 2017 Loan Agreement, 2018 Loan Agreement, and Assignment Agreement with Kenmare. While it is obvious the Garcia Parties conjured their theory of fraud and misrepresentation solely to avoid repayment of their indebtedness, it is also obvious that the Garcia Parties' claims of fraud fail as a matter of law.

The Garcia Parties' fraud claim falls into two separate categories: (1) fraud based on oral representations and independently obtained marketing materials that purportedly contradict the relevant contracts; and (2) fraud based on the improper use and investment of deferred attorneys' fees. Both the evidence and relevant law establishes that a claim for fraud does not lie when the terms of a written contract contradict any alleged oral representation. Furthermore, a claim for fraud does not lie when a party has not sustained damages. As set forth below, the Garcia Parties' claims for fraud are meritless, unsupported by law, and cannot save the Garcia Parties from an impending judgment in an amount greater than $8,000,000.00.

#### i. The Terms of the Loan Agreements and Assignment Agreement Overcome Any Alleged Oral Misrepresentation.

In order to assert a valid claim or defense of fraudulent misrepresentation, a party must establish, among other things, they justifiably relied upon false representations that were intended

to induce that party take action to their detriment. *Shrock v. Meier*, 2024 IL App (1st) 230069, ¶ 27, 270 N.E.3d 871, as modified on denial of reh'g (July 14, 2025); *Boeing Co. v. Sw. Airlines Pilots Ass'n*, 716 S.W.3d 140, 151 (Tex. 2025)[1]. A party cannot reasonably rely upon oral representations that are contradicted by a written contract. *See Adler v. William Blair & Co.*, 648 N.E.2d 226, 232 (Ill. App. 1995); *Marshall v. MarOpCo, Inc.*, 714 S.W.3d 724, 753 (Tex. App. 2025). Contractual waivers and integration clauses will be upheld by the court when a sophisticated party represented by counsel disclaims reliance on oral representations. *See Greer v. Advanced Equities, Inc.*, 2012 IL App (1st) 112458, ¶ 12, 964 N.E.2d 772; *Int'l Bus. Machines Corp. v. Lufkin Indus*., LLC, 573 S.W.3d 224, 229 (Tex. 2019). The unequivocal record evidence demonstrates that the Garcia Parties cannot make a showing of justifiable reliance.

Unable to dispute that GLG received the funds and failed to repay them, the Garcia Parties attempt to escape their written obligations by asserting that they relied on oral representations by BHC's representative concerning a separate tax-deferral arrangement and marketing materials independently found. Specifically, the Garcia Parties assert that BHC's former CEO, B.J. Etscheid told Garcia:

(1) The Brook-Hollow tax plan was "foolproof";

(2) The IRS approved the tax plan;

(3) BHC and BHC have been utilizing the tax plan offered to GLG for years and never had a complaint or inquiry filed by the IRS;

(4) If the IRS ever made an inquiry, BHC and BHF would immediately advice the Garcia Parties of the inquiry; and

[1] In diversity actions brought in the Fifth Circuit, state substantive law will apply. *Krieser v. Hobbs*, 166 F.3d 736, 739 (5th Cir. 1999). In the event that the Court determines Garcia Parties' affirmative defenses and counterclaim are governed by Texas law instead of Illinois law, citations to authority in both Illinois and Texas courts are provided.

> (5) GLG's fees assigned to Kenmare would be invested in safe, reliable investments that would provide GLG with substantial rewards when the funds were paid back.

(Doc. No. 38, ¶ 121 a-e).

Garcia confirmed that the alleged misrepresentations were oral statements, and she did not have any written documentation which could possibly confirm that the alleged statements were ever actually made. (Malinowski Decl., Ex. 3 at 79:4-11). Garcia further admitted there were no documents that would prove Mr. Etscheid ever represented: (1) the challenged transactions were foolproof; (2) certain rates of investment returns were promised; (3) the IRS approved the fee deferral transaction; (4) BHC never had an IRS inquiry; (5) BHC would notify GLG of any future IRS inquiry; or (6) GLG's deferred fees would be invested in safe, reliable investments. (*Id*. 185:4-189:2). Notably, Garcia admitted BHC never sent her any marketing materials, and that she could not identify any specific marketing materials that contains the fraudulent misrepresentations the Garcia Parties allegedly relied upon. (*Id*. 193:6-25; 166:9-167:24). Likewise, Willie Garcia, who principally communicated with Mr. Etscheid regarding GLG's financing, could not identify any writing memorializing the alleged representations concerning investment growth, interest credits, or repayment of the loans through deferred fees. (Malinowski Decl., Ex. 26 at 143:10–145:24). Although Mr. Garcia claimed such matters were discussed, he admitted that neither he nor Garcia ever reduced those alleged representations to writing. (*Id.* at 146:1–23).

Even if the Garcia Parties could identify a written statement or specific article containing misrepresentations, which they cannot, the Garcia Parties fraud theory fails as a matter of law because the terms of the 2017 Loan Agreement, 2018 Loan Agreement, and Assignment Agreement each contain unambiguous terms that contradict each alleged misrepresentation. First, the 2017 Loan Agreement contains a bolded acknowledgement that unequivocally states the following: (1) GLG agreed to the terms of the agreement and all other related documents

"**WITHOUT DURESS OF COERSION**," (2) GLG carefully read the agreement and related documents and related terms; (3) GLG knowingly consented to all waivers; and most importantly (4) GLG agreed that neither BHC nor anyone on its behalf made "**ANY STATEMENT OR PROMISE THAT MAY CONTRADICT IN ANY WAY WHAT IS WRITTEN IN THIS AGREEMENT OR IN ANY RELATED DOCUMENT**." (Johnson Decl., Ex. 2 at 9) (emphasis in original). The 2017 Loan Agreement also states the "Agreement amends, supplements, and replaces all prior agreements and written and verbal understandings between the parties with respect to all matters discussed in or relating to this Agreement." (*Id*. at 8). Garcia, on behalf of both GLG and as guarantor, expressly agreed to each of these acknowledgements, and all other terms contained therein, by signing the 2017 Loan Agreement.

Second, the Garcia Parties also certified by signing the 2018 Loan Agreement that (1) GLG agreed to be subject to the agreement and all related documents "**AS ITS OWN FREE ACT AND DEED, WITHOUT DURESS OR COERCION; (2) [GLG] HAS CAREFULLY READ THIS AGREEMENT AND EACH RELATED DOCUMENT AND AGREES TO ALL THEIR TERMS AS WRITTEN; AND (3) [GLG] KNOWINGLY CONSENTED TO ALL WAIVERS**." (Johnson Decl., Ex. 6 at 16) (emphasis in original). The Garica Parties also agreed that all prior written and verbal understandings pertaining to the 2018 Loan were replaced and superseded by the terms of the 2018 Loan Agreement. (*Id*.)

Third, and most importantly, the Assignment Agreement contains countless waivers, acknowledgements, and other terms which overcome the Garcia Parties allegations of fraud. Specifically, GLG explicitly agreed under the Assignment Agreement that any future payment amounts based on "investment performance . . . **ARE NOT GUARANTEED** and that [GLG] may not receive a portion of, or all of such payments." (Johnson Decl., Ex. 5 at 2) (emphasis in original).

Furthermore, GLG acknowledged that GLG has no ownership rights in the Deferred Fees until 2039 and that GLG has not relied upon any "representations or guarantees made by the Assignee, its agents or assigns or the Assignor with regards to this agreement and payments other than as set out in writing in this agreement." (*Id*. at 3). Lastly, GLG acknowledged multiple times "that it has been advised to seek independent legal and tax counsel regarding this transaction. . . . [and] there may be future tax consequences to it as a result of entering into this transaction." (*Id*. at 3, 9).

As a matter of law, the Garcia Parties cannot rely on any oral representation or marketing materials that contradict the unambiguous written terms of the agreements the Garcia Parties signed. As stated by the Illinois Court of Appeals,

> One is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement. . . . And the law is that a party who signs an instrument relying upon representations as to its contents when he has had an opportunity to ascertain the truth by reading the instrument and has not availed himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations.

*Belleville Nat. Bank v. Rose*, 456 N.E.2d 281, 284 (Ill. App. 1983) (citing *Leon v. Max E. Miller & Son, Inc.*, 320 N.E.2d 256, 260 (Ill. App. 1974)).

Similarly, the Texas Supreme Court confirmed:

> We recognize a long-standing principle that a party claiming fraud has a duty to use reasonable diligence in protecting his own affairs—specifically that in an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated. *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962); *see also Orca Assets*, 546 S.W.3d at 654. A failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party. *Thigpen*, 363 S.W.2d at 251. Accordingly, a plaintiff may not blindly rely on a representation by a defendant when the plaintiff's knowledge, experience, and background alert it to investigate the defendant's representations before acting in reliance on those representations. *See Orca Assets*, 546 S.W.3d at 654.

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019).

The written agreements here directly contradict the oral representations on which the Garcia Parties fraud claims rely, and contain integration clauses that amend, supplement and replace all prior agreements and written and verbal understandings between the parties with respect to all matters discussed in or relating to the agreements. Garcia was also advised that any return on the investment of GLG's attorneys' fees that were assigned to Kenmare **were not guaranteed**. Furthermore, Garcia conceded, via execution of the Assignment Agreement, that she had not relied upon any representations or guarantees relating to the investment of the Garcia Parties' attorneys' fees. Lastly, the Garcia Parties repeatedly acknowledged they were advised to seek independent tax and legal advice pertaining to the investment of GLG's attorneys' fees. Garcia would have been aware of these contract terms had she read the agreements.

Garcia was obligated to read the agreements before signing them, and her failure to do so does not amount to fraud. As a matter of law, "[a] contract does not become voidable simply because one party drafted the document and the other party chose not to retain counsel or read the document before signing it." *Lyons Lumber & Bldg. Ctr., Inc. v. 7722 N. Ashland, LLC*, 2016 IL App (3d) 140487, ¶ 28, 59 N.E.3d 830. In fact, "[i]t is well-settled law in Illinois that a competent adult is charged with knowledge of, and assent to, a document that he willingly signs, and that ignorance of the contents of that document does not avoid its effect." *Id.*; *see also CC & T Enters., LLC v. Texas 1031 Exch. Co.*, 673 S.W.3d 631, 643 (Tex. App. 2023) (holding a party had a duty to protect themselves by reading documents they sign, and any failure to read an agreement that they had the opportunity to review and read does not excuse non-performance).

Garcia's own admissions during deposition firmly confirm that the Garcia Parties failed to use any reasonable diligence to protect themselves, and instead blindly entered into the three challenged transactions. Garcia testified that she neither read the 2017 Loan Agreement, 2018 Loan

Agreement, nor the Assignment Agreement, and instead merely skimmed the contracts. (Malinowski Decl., Ex. 3 at 48:7-19; 117:8-15; 142:18-143:1). Garica also testified that she never sought out legal counsel or tax counsel prior to executing the contracts despite the contracts advising her to do so. (*See id.*) Garcia's father similarly acknowledged that a practicing attorney, such as his daughter, should review the terms of a multimillion-dollar loan agreement before executing it, and testified that he advised Garcia to review the documents and proceed as she thought appropriate. (Malinowski Decl., Ex. 26 at 94:16–96:17).

Certainly, the Garcia Parties' reliance on alleged oral representations or extrinsic marketing materials was unjustified as a matter of law. Garcia is not a layperson who was rushed through documents she could not understand; she was a licensed, practicing attorney at the time she received and signed the agreements. (Malinowski Decl., Ex. 3 at 68:6-11). A party's relative knowledge, opportunity to investigate, and prior business experience must be considered in evaluating whether reliance was justified. *Metro. Cap. Bank & Tr. v. Feiner*, 2020 IL App (1st) 190895, ¶ 47, 179 N.E.3d 847; *Comcast Corp. v. Houston Baseball Partners LLC*, 627 S.W.3d 398, 417–18 (Tex. App. 2021). It is completely illogical for a practicing attorney to claim fraud because alleged oral representations did not align with the unambiguous terms of three contracts she signed, specifically when such contracts explicitly disclaim any reliance upon extrinsic representations and disclaim any guaranteed return on investment.

Lastly, the Garcia Parties' illogically assert that the existence of the Summons Enforcement Action supports their fraud claim However, the Summons Enforcement Action is wholly irrelevant to the Garcia Parties fraud claim and defense. The relevant agreements the Garcia Parties executed were entered into in 2017 and 2018, while the Summons Enforcement Action was not commenced until 2024. Certainly, as a matter of law, any representation relating to an event which occurs

nearly a decade after a contract was executed could not possibly amount to fraud, and certainly could not have been relied upon at the time of execution. *Dvorkin v. Soderquist*, 2022 IL App (1st) 201368, ¶ 88, 208 N.E.3d 445. Thus, although the Summons Enforcement Action never resulted in an adverse ruling or determination of wrongdoing, its existence in no way supports the Garcia Parties' claim or defense of fraud.

As there are no facts under which the Garcia Parties can show any reliance upon alleged misrepresentations was justified, BHC is entitled to judgment as a matter of law on its breach of contract claim against GLG. Conversely, BHC is entitled to summary judgment on the Garcia Parties' affirmative claim for fraudulent misrepresentation.

**ii. The Garcia Parties Have Not Suffered Any Damages.**

As a matter of law, a claim or defense of fraud requires the asserting party to establish they have suffered damages as a direct and proximate result of the fraud. *Shrock* 2024 IL App (1st) 230069, ¶ 27; *Boeing Co.*, 716 S.W.3d at 151. The Garcia Parties assert they have suffered damages due to the loss of attorneys' fees which were assigned to Kenmare, not BHC, and were to be invested by Kenmare in accordance with the Assignment Agreement. The glaring issue with the Garcia Parties' fraud claim is that they have suffered no damages because the assigned attorneys' fees were invested in accordance with the Assignment Agreement and are not due to be paid to GLG until 2039. *See Dloogatch v. Brincat,* 920 N.E.2d 1161, 1169 (Ill. App. 2009) ("damages may not be predicated on mere speculation, hypothesis, conjecture or whim") (internal quotations omitted); *Bancroft Life & Cas. ICC, Ltd. v. GRBR Ventures, L.P.*, 12 F. Supp. 3d 980, 994 (S.D. Tex. 2014) ("A potential future injury is insufficient to satisfy the injury element" of a fraud claim as a matter of Texas law).

Under the express terms of the Assignment Agreement, GLG relinquished ownership and control of the Deferred Fees to Kenmare, meaning they have no present ownership rights to the

fees they allege were taken from them. (Johnson Decl., Ex. 5 at 1-2). In addition, GLG explicitly acknowledge that investment-based payments were not guaranteed and that GLG had no right or claim to the Deferred fees until 2039. (*Id*. at 3). Therefore, the Garcia Parties have no basis to claim damages pertaining to the growth of the assigned attorneys' fees, nor would the Garcia Parties even have a ripe claim for fraud for nearly thirteen years.

Even if the Court determines the Garcia Parties fraud claim is presently ripe for adjudication, the evidence in the record establishes the fees assigned to Kenmare were invested in accordance with the unambiguous terms of the Assignment Agreement and have accrued more than $300,000.00 in interest. Exhibit One to the Investment Policy Statement set forth in the Assignment Agreement explicitly provides that GLG agreed to invest the Deferred Fees in private debt, *i.e.* a promissory note with Staigue Fort in the amount of $2,224,651.97, which became due and owing in 2038. (Johnson Decl., Ex. 5 at 15). GLG's account statements from Kenmare prove that the assigned fees were invested in private debt through a note with Staigue Fort in the amount of $2,224,651.97 with an interest rate of 1.75 percent. (*See* Malinowski Decl., Exs. 18-19).

As of September 23, 2026, the GLG account owned by Kenmare had a principle balance of $2,224,651.81, and accrued interest in the amount of $300,571.81. (Malinowski Decl., Ex. 22). The present value of the GLG account was certified by Kenmare's own director, Brian Culligan. (*Id*.). Certainly, the evidence proves that GLG's assigned fees were invested exactly how they were required to be invested under the Assignment Agreement. Importantly, Garcia explicitly admitted she has no evidence that the fees GLG assigned to Kenmare were not improperly invested. (Malinowski Decl., Ex. 3 at 235:6-15). Unsupported speculation cannot create a question of fact sufficient to defeat a summary judgment motion. *See SMS Fin. CH, LLC v. Feurer,* 2025 IL App (1st) 250033, ¶ 43, 277 N.E.3d 431 reh'g denied (Dec. 3, 2025), appeal denied, 279 N.E.3d 197

(Ill. 2026); *Dillard v. SNC-Lavalin Eng'rs & Constructors Inc*., 629 S.W.3d 692, 697 (Tex. App. 2021).

Most importantly, the Garcia Parties cannot presently state a claim for fraud because they have no present rights to or interest in the attorneys' fees assigned to Kenmare, and therefore have no present damages. The Garcia Parties' damages, if any, are remote and speculative at best. As a matter of law, damages that are remote and speculative are not recoverable as a matter of law. *Dloogatch,* 920 N.E.2d at 1169; *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Accordingly, BHC is entitled to judgment as a matter of law on its breach of contract claims, and the Garcia Parties' claim of fraudulent misrepresentation.

**IV. BHC is Entitled To Summary Judgment on Count III Because Garcia Guaranteed the Obligations of the GLG.**

As it is clear as a matter of law that GLG breached both the 2017 Loan Agreement and 2018 Loan Agreement as a matter of law, Garcia is equally liable under the two guarantees. The evidence in the record establishes that Garcia personally guaranteed GLG's debts under the loan agreements, and breached both the 2017 Guaranty and 2018 Guaranty by failing to honor GLG's payment obligations. To prevail on a breach-of-guaranty claim, a party must establish (1) the existence of a valid and enforceable guaranty contract; (2) performance by the plaintiff; breach of the guaranty by defendant; and (4) a resulting injury. *Amos Fin., LLC v. Szydlowski*, 2022 IL App (1st) 210046, ¶ 32, 214 N.E.3d 158; *see Gold's Gym Franchising LLC v. Brewer*, 400 S.W.3d 156, 160 (Tex. App. 2013).

The evidence in the record is unequivocal. In connection with the 2017 Loan, Garcia executed the 2017 Guaranty, under which she unconditionally guaranteed all of GLG's obligations under the 2017 Loan Agreement. (Johnson Decl., Ex. 3). Garcia acknowledged that no oral agreements existed that contradicted the terms of the guaranty or any other loan documents. (*Id.*

at 4). Garcia also waived all defenses that she may have against BHC with regard to GLG's payment obligations. (*Id*. at 2). By signing the 2017 Guaranty, Garcia certified that she thoroughly read the 2017 Guaranty, knowingly agreed to all waivers thereunder, and acknowledged that nobody had made any statements to her that contradicted any term of the guaranty or 2017 Loan Agreement. (*Id*. at 4). Garcia admitted to signing the 2017 Guaranty, although she conceded she did not review with counsel or read the document thoroughly. (Malinowski Decl., Ex. 3 at 74:1-75:2).

Similarly, in connection with the 2018 Loan, Garcia executed a 2018 Guaranty, under which she unconditionally guaranteed all of GLG's obligations under the 2018 Loan Agreement. (Johnson Decl., Ex. 6 at 2-5). The 2018 Guaranty also contained an acknowledgement that no oral agreements existed which would contradict the terms of the 2018 Guaranty or other loan documents, that Garcia waived all defenses to any claim brought by BHC, that Garcia agreed to all waivers, and that Garcia understood and agreed to all provisions therein. (*Id*. at 3-5). Garcia admitted that she willingly executed the 2018 Guaranty. (Malinowski Decl., Ex. 3 at 134:3-21).

As set forth above, there is no question of material fact that GLG breached both of the 2017 Loan Agreement and 2018 Loan Agreement by failing to satisfy any payment obligations thereunder, among other things. Accordingly, as BHC's defaults triggered Garcia's payment obligations under the 2017 Guaranty and 2018 Guaranty, and the record shows that Garcia never made a payment to BHC, BHC is entitled to summary judgment on its breach-of-guaranty claims against Garcia. (*See* Malinowski Decl., Ex. 3 at 151:2-10).

Importantly, Garcia has no defense to enforcement. In each guaranty she waived any and all defenses to claims brought by BHC, and acknowledged that no oral agreements existed that contradicted the guaranties or the loan documents. As a matter of Illinois law, when parties execute

a valid, integrated agreement, any extrinsic evidence, including prior statements, are excluded from consideration and are incompetent as a matter of law. Air Safety, Inc. v. Tchrs. Realty Corp., 706 N.E.2d 882, 885 (Ill. 1999). Furthermore, Illinois courts will enforce waiver provisions in personal guarantees, including waivers of any and all possible defenses. *Bank of Am., N.A. v. 108 N. State Retail LLC*, 928 N.E.2d 42, 55 (Ill. Ct. App. 2010); *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 8 (Tex. 2014). Accordingly, as the record unequivocally establishes Garcia breached both the 2017 Guaranty and 2018 Guaranty, and Garcia waived all defenses, BHC is entitled to summary judgment on Count III against Garcia as a matter of law.

## V. BHC is Entitled to Specific Performance.

Under the 2017 Loan Agreement and 2018 Loan Agreement, BHC is entitled to all of GLG's "financial information and statements, reports, aging of receivables and payables, budgets, forecasts, and such other reports with respect to [GLG's] business operations," as well as all financial and accounting records maintained in accordance with generally accepted accounting principles. (Johnson Decl., Ex. 2 at 5; *id*. Ex. 6 at 13). However, GLG has refused to provide such information to BHC to date.

As a matter of law, a party is entitled to specific performance upon proof an enforceable contract was breached and a showing that the requesting party "ready, willing, and able to perform the contract." *Hoxha v. LaSalle Nat. Bank*, 847 N.E.2d 725, 729 (Ill. Ct. App. 2006); J*ennings v. Jennings*, 625 S.W.3d 854, 867 (Tex. App. 2021). Furthermore, the 2017 Loan Agreement and 2018 Loan Agreement each grant BHC authority to seek an order for specific performance of the loan agreements upon the occurrence of a breach. (Johnson Decl., Ex. 2 at 7; *id*. Ex. 6, at 15). As set forth above, GLG breached both the 2017 Loan Agreement and 2018 Loan Agreement after BHC complied with all of its obligations thereunder by making loan disbursements to GLG as requested. Accordingly, BHC is entitled to an order for specific performance requiring GLG to

produce all financial information, financial statements, and accounting records in accordance with the terms of both the 2017 Loan Agreement and 2018 Loan Agreement.

## VI. BHC is Entitled to a Declaration That GLG's Accounts Receivable and Other Rights to Payment Are Subject to BHC's Security Interest and Are Payable to BHC.

Due to the Garcia Parties breaches of the 2017 Loan Agreement and 2018 Loan Agreement, BHC is entitled "directly collect and receive all proceeds and payments arising under or in any way accruing from the Collateral as such amounts become due and payable." (*See* Johnson Decl., Ex. 2 at 6; *id*. Ex. 6 at 14). Collateral is defined as in both loan agreements, in part, as GLG's "rights to receive payment or otherwise, for legal and other services rendered and to be rendered." (Johnson Decl., Ex. 2 at 4; *id*. Ex. 6 at 11). Accordingly, BHC is entitled to a declaration from the Court that all GLG's accounts receivable and other rights to payment constitute Collateral under the loan agreements, BHC has a security interest in such Collateral, and BHC may enforce its security interest on the Collateral to satisfy GLG's outstanding debt under the 2017 Loan Agreement and 2018 Loan Agreement.

## CONCLUSION

For the reasons set forth herein, Brook-Hollow Capital, LLC respectfully requests that the Court enter an order for summary judgment in its favor and against the Garcia Law Group PLLC and Maria L. Garcia, and grant Brook-Hollow Capital, LLC the following relief:

1. Award BHC damages in its favor and against the Garcia Law Group PLLC and Maria L. Garcia, jointly and severally, in an amount of no less than $8,022,991.18, together with all accrued interest after September 16, 2026 and post-judgement interest;

2. Order the Garcia Law Group PLLC to produce and deliver to BHC all of the Garcia Law Group PLLC's financial information and statements, reports, aging of receivables and payables, budgets, forecasts, and all accounting records maintained in accordance with generally accepted accounting principles;

3. Declare that all of GLG's accounts receivable and other rights to payment are subject to the security interest of BHC;

4. Dismiss with prejudice the Garcia Law Group PLLC and Maria L. Garcia's counterclaim for fraudulent misrepresentation with prejudice and on the merits;

5. Award BHC all its attorneys' fees and costs of collection incurred in this litigation; and

6. Award BHC all such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Dated: October 21, 2026

By: */s/ David G. Oliveira*
David G. Oliveira
**ROERIG, OLIVEIRA & FISHER, LLP**
10225 N. Tenth St.
McAllen, Texas 78504
(956) 393-6300 Telephone
(956) 386-1625 Telecopier
Email: doliveira@rofllp.com
Texas State Bar No. 15254675

By: /s/*Austin J. Malinowski*
Austin J. Malinowski (Pro hac vice)
**COZEN O'CONNOR**
Minnesota State Bar No. 0505204
150 S. 5th Street, Suite 1200
Minneapolis, Minnesota 55402
Telephone: 612-877-5318
Email: AMalinowski@cozen.com

*ATTORNEYS FOR BROOK-HOLLOW CAPITAL, LLC*